## Rick et al. v. Cramp

*Randolph Stauffer*, for plaintiffs.

*Warren K. Hess* and *Morgan D. Reinbold*, for defendants.

MAYS, P. J., April 24, 1946.—Statement of pleadings. Plaintiffs brought this action to restrain defendants from maintaining an undertaking establishment or funeral home on defendants' premises at 934 Centre Avenue, Reading, Pa.

It is alleged that plaintiffs Rick, Sternbergh and Bausher as owners, and plaintiff Henshall as tenant, occupy dwelling houses in the immediate vicinity of the property of defendants; that defendants are threatening to establish and operate a funeral home and undertaking establishment upon their premises; that the properties of both plaintiffs and defendants are situated in a section of the city used exclusively for

residential purposes; and it is further alleged that if said defendants are permitted to establish, maintain and operate said funeral home on said property, the value of plaintiffs' properties and the desirability thereof as homes will be greatly decreased; that frequent funerals will be conducted from said funeral home, and the frequent coming and going of hearses will create a constant reminder of death and will be depressing to plaintiffs and their families and friends; and that the establishment, maintenance and carrying on of said funeral home on said premises in the particular location described will injuriously affect the comfort and ordinary enjoyment of plaintiffs' homes by the dwellers therein.

The answer admits that defendants own the property complained of; that Irvin J. Cramp, trading as Cramp Funeral Home, intends to conduct an undertaking business therein unless restrained by the court. It is alleged that the section in which plaintiffs' and defendants' homes are located is not a residential district; and that the operation of an undertaking business will not be a nuisance per se. They deny that the operation of such a home will affect the comfort and ordinary enjoyment of plaintiffs' homes by the dwellers therein. They further allege that the residences of plaintiffs and of defendants are located very close to the Charles Evans Cemetery, and that funerals in said cemetery are an almost daily occurrence; that funeral processions entering said cemetery pass by the residences of the parties to this cause, and also that Laureldale Cemetery, situated north of the city limits of the City of Reading, has frequent funeral processions going to said cemetery from the City of Reading, which traverse past the residences of the respective parties. They further aver that they intend to make extensive repairs, improvments and alterations to their premises, with the result that the values of the properties

in the neighborhood will be enhanced instead of decreased.

### Findings of fact

1. Plaintiffs, at the date of the trial of the cause, were owners or lessees of properties in the City of Reading, Pa., situate on Centre Avenue, as follows: J. H. Sternbergh, 957 Centre Avenue; Solon D. Bausher, 925 Centre Avenue; Lawrence D. Henshall, tenant of Solon D. Bausher, 935 Centre Avenue, and Charlotte Curtis Rick, 930 Centre Avenue.

2. Defendants are the owners of the property situate at 934 Centre Avenue, the dimensions of the lot being, on Centre Avenue 100 feet 6 inches; on the north 198 feet $3\frac{5}{8}$ inches; on North Second Street 102 feet $10\frac{1}{4}$ inches; and irregular on the south, 226 feet $1\frac{1}{4}$ inches plus 17 feet $2\frac{5}{8}$ inches.

3. Defendant Irvin J. Cramp is an undertaker duly licensed by the Commonwealth of Pennsylvania, and proposes to use the premises situate at 934 Centre Avenue as his residence and as a funeral home.

4. The premises were vacant and unkept and were used for storing contractors' supplies, and were for sale for several years prior to September 1945.

5. Defendant Irvin J. Cramp does not intend to make any external changes to the building, and will make only such as may be needed inside of the building to adapt the premises for use as a residence and funeral home.

6. Defendant has already made improvements on the grounds and repairs to the building.

7. Defendant proposes to arrange the building as follows: His home is to be on the second and third floors; the funeral home is to be on the first floor; the entire first floor exclusive of the rear wing is to be used as service rooms; the rear wing is to contain three slumber rooms and a preparing room; the display room, if any, will be located in the basement.

8. Defendant proposes to employ a competent landscape architect to arrange proper plantings on the grounds.

9. Defendant proposes to plant a close evergreen hedge eight feet high along the south side of the driveway.

10. Defendant proposes to plant a large rose garden in the rear of the premises.

11. Defendant does not propose to floodlight the premises.

12. The distance from the curb of the premises 934 Centre Avenue to the building is 67 feet. The distance from the Rick-Cramp boundary line marked by a hedge to the south wall of the Cramp building is 43 feet, and the distance from the south wall of the rear wing to the hedge is 72 feet, and the rear wing of the Cramp premises extends 23 feet beyond the end of the rear porch of the Rick premises.

13. The length of the driveway on the Cramp premises is 225 feet.

14. The driveway on the Cramp property is five to six feet higher than the ground level of the Rick property.

15. There is a concrete area in the rear of the premises 42 feet by 36 feet capable of accommodating at least four cars.

16. Defendant proposes to have funeral processions leave the grounds via the Second Street exit.

17. Defendant conducts an average of 102 funerals per year, 15 percent of which are held at private residences.

18. Centre Avenue is a busy and much-traveled highway.

19. On Wednesday, October 17, 1945, from 8 o'clock a.m. to 12:20 o'clock p.m., and from 1:20 o'clock p.m. to 5 o'clock p.m., 1,452 pleasure cars, 470 trucks, 15 buses and 91 trolley cars traversed Centre Avenue going either north or south.

On Thursday, October 18, 1945, counting until 6 o'clock p.m., there were 1,740 pleasure cars, 507 trucks, 25 buses, and 113 trolley cars.

Similarly, on Friday, October 19, 1945, from 8 o'clock a.m. to 6 o'clock p.m., there were 1,927 pleasure cars, 547 trucks, 20 buses, and 120 trolley cars.

20. Noises caused by the coming and going of pleasure cars, buses, trolleys, coal and other trucks in the neighborhood are almost continuous throughout the day and night.

21. Funeral processions on Centre Avenue are almost a daily occurrence.

22. There are more than 690 funeral processions which traverse the length of Centre Avenue annually.

23. Frequent funerals are held at St. Margaret's Roman Catholic Church, which is within a very short distance from plaintiff J. H. Sternbergh's residence.

24. The southern boundary of the Charles Evans Cemetery is approximately 150 feet from plaintiff J. H. Sternbergh's residence, and somewhat farther from the residences of the other plaintiffs.

25. The said Charles Evans Cemetery occupies 120 acres, contains approximately 51,400 graves, and has a crematory building and columbarium within a few blocks of plaintiffs' residences.

26. The purchase price of the Cramp premises on September 11, 1945, was $18,000, and the present assessed valuation is $25,000.

27. The purchase price of plaintiff J. H. Sternbergh's premises on August 24, 1943, was $5,000, and the present assessment is $20,400.

28. The assessments of the properties of the other plaintiffs are as follows: Charlotte Curtis Rick, $19,000; Solon D. Bausher (occupied by Lawrence D. Henshall), $21,500; Solon D. Bausher, $51,000.

29. Since the triennial assessment made in 1927, the assessed valuation of the properties on Centre Avenue

and on North Second Street between Windsor and Spring Streets has declined, in some instances as much as 30 percent and in others as high as 50 percent. The sale value of some of the properties has declined as much as 70 percent.

30. The presence of a funeral home at 934 Centre Avenue will not depreciate the values of the properties in the immediate vicinity.

31. Other residents in the immediate neighborhood favor the establishment of the funeral home at 934 Centre Avenue.

32. Persons who have adapted themselves to residence near a large cemetery and are accustomed to seeing numerous funeral processions passing by their homes, can readily adapt themselves to the presence of a funeral home without suffering functional disorders.

### *Discussion*

It must be admitted that as one views Centre Avenue on both sides between Windsor and Spring Streets, it has all the appearance of being a residential section. If, however, we enlarge our view, particularly in the light of the evidence in this case, and comprehend the area bounded on the north by Robeson Street, on the east by North Fourth Street, on the south by Greenwich Street, and on the west by North Front Street, we have a section of the city that is slowly becoming commercialized. Within this area there are 151 apartment houses, 48 business places, three social clubs, 146 individual garages, and four public garages. Between Douglass and Windsor Streets is the Reading Boat Works; at Centre Avenue and Greenwich Street, the Logan Drug Store; at Third and Spring Streets, a dry cleaning establishment; at 909 North Third Street, a hand laundry and rooming house; and on the southeast corner of Thorn and Douglass Streets, a taproom. In the block in which the funeral home is to be estab-

lished there are three old residences which have been converted into apartments. Whether we consider the limited area first referred to or the more comprehensive one, the mere location of a funeral home, being a lawful business, is not sufficient to make such an establishment a nuisance per se even in a purely residential district.

In Smith et al. v. Baumeister, 53 York 137, Sherwood, P. J., said (at pp. 138-39):

"A funeral parlor is not a nuisance *per se:* McCann v. McCabe, 300 Pa. 35. When conducted in a residential district, it may be a nuisance in fact: Miner v. Loomis, 25 D. & C. 275. . . .

"No general rule as to what constitutes a private nuisance in a residential neighborhood can be laid down. In Kestner v. Homeopathic Medical and Surgical Hospital, 245 Pa. 326, the court, quoting from Wood in Nuisances, said: 'The locality, the condition of the property, and the habits and tastes of those residing there, divested of any fanciful notions, or such as are directed by dainty modes and habits of living, is the test to apply in a given case. In the very nature of things, there can be no definite or fixed standard to control every case in any locality. The question is one of reasonableness or unreasonableness in the use of the property, and this is largely dependent upon the locality and its surroundings.' "

"2. Although a useful employment may produce discomfort or injury to those near to it, it does not follow that it should be restrained.

"3. The aid of a court of equity is not of right but of grace; to be extended only where its exercise is certainly just, wise and proper.

"4. In a question of restraining a lawful business, a court of equity will consider the customs of the people, the characteristics of their business, the common uses of property and the peculiar circumstances of the place": Syllabus of Huckenstine's Appeal, 70 Pa. 102.

My inquiry here is not whether the establishment of this funeral parlor is obnoxious to this or that individual, but whether it is of such a character as to be obnoxious to mankind generally, similarly situated.

In Westcott v. Middleton, 43 N. J. Eq. 478, 11 A. 490, Bird, V. C., said (at p. 483):

"Before the court can condemn a trade or calling, it must appear that it cannot be carried on without working injury or hurt to another; and, as I have said, that injury or hurt must be such as would affect all reasonable persons alike, similarly situated. The law does not contemplate rules for the protection of every individual wish, or desire, or taste. It is not within the judicial scheme to make things pleasant or agreeable for all the citizens of the state."

With this our understanding of the law applicable to this case, after a careful study of the evidence I must conclude that there are no grounds—at least plaintiffs have not satisfied us by a fair preponderance of the evidence that there are any—for enjoining the operation of this funeral parlor. As pointed out, the gravamen of plaintiffs' bill is that the operation of a funeral home at 934 Centre Avenue would seriously affect the comfort and ordinary enjoyment of plaintiffs' homes and that the value of their properties would be decreased. In regard to the former we have the testimony of Mrs. Rick, Mrs. Henshall, Mr. and Mrs. Sternbergh, and Mr. Bausher. No other occupiers or owners of property in this block have complained. On the other hand, witnesses were called by defendants whose properties, located on Second Street, face defendants' property. All of them testified in effect that for a number of years defendants' property was unoccupied except for storage purposes and that it was falling into ruin and decay; that the operation of a funeral home at 934 Centre Avenue would not affect their health and well-being. There were a number of

other witnesses called by defendants who live in the immediate vicinity of the present Cramp Funeral Home, and all of them say that the presence of the home in no way affected their health or well-being.

Plaintiffs stress the point that the location of a funeral home at this place would affect their health. Dr. Ralph L. Hill, a well-known authority in mental diseases, testified that it is natural for a normally healthy person to have a fear of death and an abhorrence of coming in contact with the dead, and that these emotions are aroused in people living in a vicinity where death is exhibited more or less rather constantly, and its constant presence has an effect upon their physical health.

Another witness called by plaintiffs, Dr. Frederick H. Leavitt, a well-known specialist in mental and nervous diseases and head of the department of neuropsychiatry of the Reading Hospital, testified much to the same effect. He stated, however, that persons who have lived for some time in close proximity to a large cemetery could adapt themselves to the operation of a funeral home in the neighborhood.

Dr. John R. Bower, a neuro-psychiatrist called by defendants, testified: ". . . in my opinion, except for possibly the first week or two, I do not think there would be any effect on them. I do not think that a funeral home in a neighborhood will have any ill effect on the health, mental well-being of any of the neighbors."

Surely the testimony of plaintiffs in this respect is counterpoised, if not outweighed, by the testimony of defendants' witnesses.

While it is true that there would be funerals moving out of the proposed funeral home, it is fair to state that, even if the home were not operated at 934 Centre Avenue, many of them would pass by the homes of plaintiffs on Centre Avenue in going to the Charles Evans and Laureldale Cemeteries.

Peter L. Scholl, superintendent of the Charles Evans Cemetery, testified that Charles Evans Cemetery covers 120 acres, and is bounded on the west by Centre Avenue, on the south by Robeson Street, on the east by Fifth Street, and on the north by an unopened street. Erected on this land are an administration building, Mr. Scholl's residence, a chapel erected there almost 100 years ago, a crematorium and a columbarium. The crematorium is located about 150 or 200 feet west of Fifth Street and near the Robeson Street entrance. Approximately 51,400 people have been buried in this cemetery since its beginning. There was an average of 500 burials a year. The funeral processions, practically all of them, traverse Centre Avenue and enter the cemetery at the Centre Avenue entrance.

John A. Hepler, superintendent of the Laureldale Cemetery, testified that they have approximately 200 burials in that cemetery each year, and that 95 percent of those funeral processions traverse Centre Avenue.

There is located at the corner of Centre Avenue and Spring Street a Catholic church. Many funerals are held from that church.

In regard to a decrease in the value of the properties in this vicinity, there is conflicting testimony. Plaintiffs say that the property values would decrease because of the establishment of the funeral home, while other witnesses state the opposite, and in fact venture the opinion that the value of the properties would be increased, this because of the fact that defendants' property would be maintained and improved instead of being allowed to fall into decay as was the case during the past several years.

Two real estate experts were called by plaintiffs, and they say the value would be decreased, and two experts by defendants who state the opposite. Here again the testimony of plaintiffs' witnesses is counterpoised by the testimony of defendants' witnesses.

In Huckenstine's Appeal, supra, Agnew, J., said (at pp. 107-08) :

"To entitle a plaintiff to an injunction he must make out a plain case of injury and damage. 'If the injury be doubtful, eventual or contingent, equity will not interfere by injunction:' Rhodes v. Dunbar, 7 P. F. Smith 287; and a 'chancellor will consider whether he would not do a greater injury by enjoining than would result from refusing, and leaving the party to his redress at the hands of a court and jury: . . .'"

I must conclude that plaintiffs have failed to show that defendants will maintain a nuisance.

Plaintiffs rely upon a number of cases whose language indicates a tendency to make a funeral parlor a nuisance per se if it appears that there was a depreciation in the value of land and a tendency to annoyance of the peace and comfort of some inhabitants in the vicinity. A careful study of these decisions, at least some of them that I have reviewed, shows that the courts in their opinions indicated that they relied upon a more substantial basis.

Some of the cases are reviewed and distinguished in Pearson & Son v. Bonnie, 209 Ky. 307, 272 S. W. 375, 43 A. L. R. 1166 Drury, C., said:

"The resumé of these cases indicates clearly that the courts were not satisfied, although they used in their opinions some language looking that way, to rest an injunction against an undertaking parlor solely on the grounds of depreciation in property value accompanied by mental depression due to the association of ideas, and that they all insisted on some other element being present in the case, such as a zoning ordinance or the imminent probability of odors, noises, and communicable diseases coming from the property. In the case at bar there is an entire absence of those elements on which these other courts found it necessary to base their opinions."

In Miner et al. v. Loomis et al., 25 D. & C. 275, Valentine, J., points out, at p. 277, that the uncontradicted testimony of the medical experts called by plaintiffs is to the effect that the conduct of such a business:

". . . would affect a normal person deleteriously, cause mental irritation and have a bad effect mentally upon children of impressionable age, and would tend. to lower a person's general resistance and health by reason of continual irritation and worry. Real estate experts testified that the establishment of a funeral home as described by defendants' witnesses would cause a substantial depreciation in the market value of real estate in the neighborhood, and we have no hesitation in accepting such testimony as correct."

Here, as already pointed out, there is not only contradictory testimony, but the weight of the testimony in many respects seems to be with defendants.

In Smith et al. v. Baumeister, supra, Sherwood, P. J., points out, at pp. 142-43, that the expert testimony of plaintiffs' witnesses is in reality corroborated by the experts called by defendants. As to the damage suffered by plaintiffs, he points out that three real estate agents called by plaintiffs were actually supported by the testimony of one Logan whose testimony was in effect that the establishment of defendant's funeral parlor would affect the market value of the adjoining properties to a certain extent. He concludes by saying that plaintiffs have met the burden resting upon them.

The facts and circumstances surrounding this locality and the site of the proposed funeral parlor are entirely different.

In Dean et al. v. Powell Undertaking Co., 55 Cal. App. 545, 203 Pac. 1015, the court, in pointing out under what circumstances a funeral parlor may or may not be a nuisance, concluded under the facts of that case, even though there was a depreciation of

property and some disturbing of the comfort of those living close by, that defendant was not maintaining a nuisance. At p. 551, Sturtevant, J., said:

"If the particular acts, enjoined in this case, under the facts found, can be legally enjoined, then it would seem to follow that for the very same reasons nearly every hospital in the land could be enjoined. We cannot believe such is the law."

In Gowen et al. v. O'Hara et al., 15 Dist. R. 753, the chancellor, after finding that the neighborhood where a hospital was being maintained is "a closely settled suburban locality and exclusively a residential one", stated that the hospital was not a nuisance per se. This case discusses cases from other jurisdictions in which it is pointed out that a cemetery even in a residential neighborhood is not a nuisance per se. He cites with approval, at p. 757, Ellison v. Commissioners, 5 Jones' Equity (N. C.) 57, where the court said:

" 'The unpleasant reflections suggested by having before one's eyes constantly recurring memorials of death is not one of these nuisances.' "

The plaintiffs in this case, as I have pointed out, through the years have had daily reminders of death in that the Charles Evans Cemetery is within view, and almost daily funeral processions pass their houses. This in itself is quite significant and tends to mitigate whatever disturbance there may be from the fact that a funeral home is maintained within the territory where the large Charles Evans Cemetery is maintained, and these funeral processions to that cemetery, and to the Laureldale Cemetery, and to and from the Catholic church, are viewed from 600 to 700 times a year.

Defendants proposed erecting a bronze tablet on the lawn in front of their property, to be lighted with a 100-watt bulb, and the inscription thereon to be "Cramp Funeral Home". At the argument, after some discussion, the defendants expressed their willingness to

have an appropriate sign, not upon the lawn but upon the building itself.

There are a number of findings of fact to the effect that Centre Avenue is a much traveled highway, and that because thereof there are traffic difficulties. At the argument, it was pointed out that to move funeral cars through the driveway into or from Centre Avenue may cause an additional traffic hazard not only to the cars that would be used in the funeral procession but to other cars traveling upon Centre Avenue. It might be advisable in the public interest to have defendants use the entrance to this driveway at Centre Avenue merely for their private purposes. Defendants expressed their willingness to so limit their use.

### Conclusions of law

1. The evidence fails to show that the properties in the neighborhood will depreciate in value by reason of the presence of the proposed funeral home.

2. The evidence fails to show that a nuisance will result from the operation of the proposed funeral home.

3. The proposed funeral home and residence will not constitute a nuisance.

4. An injunction should not issue, but the bill should be held pending defendants' placing upon the record an agreement that the sign shall not be erected upon the lawn but upon the building itself, and that the use of the entrance to the driveway at Centre Avenue shall be merely for their private purposes and not for the moving of funeral cars into or from Centre Avenue over and across the said driveway.

5. Each party shall pay his own costs.

And now, to wit, April 24, 1946, the prothonotary is directed to enter a decree nisi in accordance with the foregoing decision, and forthwith to give notice of the same to the parties or their counsel of record, sec. reg.